WILLARD RICHMOND *vs.* SUSAN F. W. AMES.

Worcester.    September 30, October 1, 1896. — January 7, 1897.

Present: FIELD, C. J., HOLMES, KNOWLTON, LATHROP, & BARKER, JJ.

*Deed — Breach of Covenant — Encumbrance — Evidence of Bad Faith.*

A., to whom B. conveyed land bounded on a passageway, warranting it free from encumbrances, proceeded to build on it.   While so doing, C., who owned property in the rear of A.'s premises and who had rights in the way, told him that he was encroaching on the way, and that C.'s deed came first, to which A. replied that he was "going by his deed," and completed his building.   There was no other remonstrance or complaint for nine years, when, as the result of a controversy between them, A. built a fence in the rear of his building.   Subsequently C. brought a suit in equity against A. to enjoin interference with the way, in which it was decided that A. had narrowed the way, and that he must remove the fence, but not the building, and pay damages, which were afterwards assessed.   *Held,* in an action by A. against B. for breach of the covenants in his deed, in which it was agreed that, as between A. and C., the damages assessed in the equity suit and the sums paid by A. in counsel and witness fees were reasonable, and that. a certain sum was the diminution in value of A.'s

estate by reason of the encumbrance on a corner portion of it, that A. was entitled to a ruling that the evidence was insufficient to prove that he proceeded in bad faith in erecting his building.

CONTRACT, for breach of the covenants in a deed from the defendant to the plaintiff of land in Worcester. After the former decision, reported 164 Mass. 467, the case was tried in the Superior Court, before *Bishop*, J., who refused to give certain rulings requested by the plaintiff.

The jury returned a verdict for the plaintiff; and he alleged exceptions. The facts appear in the opinion.

*W. S. B. Hopkins*, (*F. B. Smith* with him,) for the plaintiff.

*R. Hoar & C. M. Thayer*, for the defendant.

BARKER, J. The case in which the present exceptions were taken is the same case which is reported in *Richmond* v. *Ames*, 164 Mass. 467, and the exceptions were taken at the new trial upon the question of damages only, ordered by the decision there reported. The new trial was before a jury, and, without going at length into testimony, the parties agreed that the facts which appear in the reported cases of *Richmond* v. *Ames*, 164 Mass. 467, and of *Green* v. *Richmond* and *Starkie* v. *Richmond*, 155 Mass. 188, so far as they were pertinent to the questions on trial, should be taken as evidence, and the jury were made acquainted with all the facts so agreed to be in evidence.

The facts with which the jury were so made acquainted were as follows.

In the year 1834 there was a passageway running easterly from Main Street, in Worcester, through land owned upon both sides by Isaac Davis. On the northerly side of the passageway, at the corner of Main Street, Davis's land was occupied by a block known as the Slater Block, extending about thirty-six feet in depth, and forming to that extent the northern boundary of the way. Beyond the southeasterly corner of the Slater Block the northern line of the passageway was not marked or defined by any structure; but at that time, and for more than twenty years prior thereto, Starkie as tenant, and all other persons who used the way and had rights of way therein as owners of lands abutting thereon, had travelled over the open space which extended eastward from the rear of the Slater Block in a northeasterly direction around the corner of the Slater Block to a

dyehouse occupied by Starkie. In 1834 Davis conveyed to the predecessors in title of Green by a deed describing land on the east side of Main Street, and adding, "Also I give and grant unto the grantees, their heirs and assigns, a right of passageway entering in at the south end of the store now occupied by Elijah A. Brigham [which was the south store in the Slater Block] and passing in the rear of my buildings, between my store and barn, to the rear of their store as it now is, and to the rear of it as it shall be extended in depth, so as to be sixty feet deep, and it is further agreed by the parties to this deed, in case the grantor, his heirs or assigns, should erect new buildings on Main Street, the passageway might be removed further east. . . . It is understood that the above passageway is to be a free and open passageway, convenient for teams to pass and repass to and from the rear of the grantee's store as the store now is, or as it may hereafter be, unless the depth of said store exceed sixty feet."

On the south side of the passageway Davis built the Quinsigamond Bank Block, and sold it in 1863 to five grantees, with a right of way in Layard Place, so called, which was the passageway mentioned. The Quinsigamond Bank Block had an ornamental front, which, at the corner upon Main Street and the passageway, projected into the passageway beyond the main line of its wall, and at different intervals along the wall there were projections into the passageway varying in width from one inch to two and a half feet.

On October 1, 1872, Davis, being the owner of the Slater Block and the open space in its rear, conveyed to Starkie certain other land abutting on Layard Place, together with a right of way in said passage to and from Main Street as said way then existed.

On April 1, 1873, Davis conveyed to the present defendant, Mrs. Ames, a tract of land described as follows: "A certain lot or parcel of land, with the buildings thereon, situated on the easterly side of Main Street in said city of Worcester, and with the privileges and appurtenances thereto belonging, bounded and described as follows: northerly, on land of James Green, one hundred (100) feet; easterly on an open passageway twenty (20) feet wide, sixty-six (66) feet more or less to an open pas-

sageway nine (9) feet four (4) inches wide; southerly on said last named passageway, one hundred (100) feet, westerly on Main Street sixty-six (66) feet more or less." The conveyance contained the usual covenants.

On October 11, 1877, Mrs. Ames conveyed to Richmond, by the deed upon the covenants in which the present suit was brought, land, the description of which was as follows: " A certain tract or parcel of land located on the easterly side of Main Street, in said Worcester, bounded and described as follows, to wit: beginning at the southwest corner of the estate hereby conveyed, which is also the southwest corner of the estate conveyed to me by Isaac Davis, by his deed bearing date April 1st, 1873, being recorded in Worcester County Registry of Deeds, book 892, page 519; thence northerly by line of said Main Street thirty-five feet, more or less, to a point in the easterly line of said Main Street, which said point would be intersected by a ·line running parallel to the southerly boundary line described in said Davis' deed, above referred to, and distant northerly sufficient to pass through a point four inches northerly from the southerly line of the southerly granite pilaster, now standing in front of the store now occupied by Hiram H. Ames; thence easterly, passing through said point, in said pilaster, and parallel to said southerly boundary line referred to in said Davis' deed, one hundred feet, to a passageway twenty feet wide; thence southerly by line of passageway thirty-five feet, more or less, to a passageway nine feet four inches wide; thence westerly by line of said way one hundred feet, to the line of said Main Street and the place of beginning, meaning and intending to convey all of the southerly portion of said estate, as far northerly as said point on said pilaster, with same distance in the rear." This deed contained the usual covenants.

The former decision in this case (see *Richmond* v. *Ames*, 164 Mass. at pages 471 and 473) held that the southerly boundary line of the land conveyed by this deed was a straight line running from the easterly line of Main Street in a southeasterly course to a twenty-foot passageway in the rear; that this line coincided with the northerly line of a tract of land, called a passageway, nine feet and four inches wide throughout its whole extent; that this northerly line of passageway is parallel with

and nine feet and four inches from the building on the south side of Layard Place; and that this passageway or tract of land and its northerly boundary line constitute a monument in the deed, and that other persons had paramount rights in some portion of the area included in the deed with its southerly line thus · established.

Within a short time after taking this deed, and before Richmond had made any alteration in the property, he discovered that other parties had rights to an open and unobstructed passage over the way, which precluded him from a right to build over the way. Without resorting to Mrs. Ames, Richmond then made a claim of damages upon Davis, and was paid by him the sum of $2,000 for surrendering the right to build over the way mentioned in the deed from Davis to Ames.

The Slater Block remained upon the land until the year 1878. Teams in going to and from the premises of Green were accustomed to pass over any part of the area in the rear of the Slater Block without objection from the owner, turning northerly after passing the southeast corner of the Slater Block instead of keeping on in a more easterly course and turning northerly within the limits of the twenty-foot way. But it was held in *Green* v. *Richmond* (see *Starkie* v. *Richmond*, 155 Mass. at page 196) that Richmond, notwithstanding this use of the area in connection with Green's premises, had the right to occupy the area with a permanent building. In the summer of 1875 Ames had built a picket fence in the rear of the Slater Block, which fence stood until after the deed of October 11, 1877, to Richmond; but there was no evidence that the fence was built for the purpose of indicating or defining the north line of the passageway, unless the existence of the fence was such evidence.

In the year 1878 Richmond removed the Slater Block and the fence, and erected the building now standing on the north side of Layard Place, which new building extends east from Main Street 80.2 feet and leaves the passageway between itself and the building on the south side of the passageway, Layard Place, of a uniform width of nine feet and four inches. While the work of removal and of rebuilding was going on, Green was abroad, and Starkie was residing and doing business on his premises in the rear, to which the passageway led. While Richmond

was engaged in the work of rebuilding, the wife of Starkie, who was authorized to represent him, went to Richmond as soon as the work had progressed enough to show where the walls were to be, and told him that he had gone over the passageway; to this Richmond replied that " his deeds were all right." Whereupon Starkie's wife said that " her husband's deeds were before his, and that her husband understood that he had nearly ten feet of passageway." Richmond completed his building. Aside from this conversation no act or communication either of Green, who returned from abroad after the completion of the new building, or of Starkie, is shown until the year 1887. The passageway as it was left by the erection of the new building continued to be used. Green did not know that the way had been narrowed until some years afterwards, although he might at any time have ascertained it by measurement. As it was determined in the cases of *Starkie* v. *Richmond* and *Green* v. *Richmond*, Richmond had in fact by his new building narrowed the passageway near the line of Main Street thirty-seven hundredths of a foot, and at the actual line of Main Street over forty-six hundredths of a foot, and he had widened it two tenths of a foot where the southeast corner of the Slater Block stood.

In the year 1887 Green and Starkie's wife had several interviews with Richmond in reference to paving the passageway from Main Street, and also the area in the rear of and up to Richmond's new building, which was done, and the expense thereof was shared by Starkie, Green, Richmond, and others who had rights in the passageway. This area between the east end of Richmond's new building and the twenty-foot passageway was left open from the completion of the building in 1878 until 1887, during which time teams passed and repassed over the open area around the southeast corner of the building to and from the premises of Starkie and of Green.

In the year 1887, and after the passageway and area were paved, there was a controversy between Richmond and Mrs. Starkie as to the condition in which the area forming the backyard of the new building was kept, and in consequence of this controversy Richmond built a fence extending from the southeast corner of the new building 19.9 feet easterly on the same line,

and then turning at a right angle and running northerly, and enclosing the open area, and part of the paved surface.

Except for the conversation above stated, between Richmond and Mrs. Starkie, at the time when the new building was in process of erection, neither Starkie nor Green took any steps toward the removal of Richmond's building or fence, or to recover damages for interference with the way, until the commencement of the suits of *Starkie* v. *Richmond* and *Green* v. *Richmond,* nor was any further complaint made by either Starkie or Green until after the building of the fence, in 1887.

Those suits were bills in equity, filed in January, 1889, to enjoin Richmond from interfering with the way, and to compel him to remove the building and fences therefrom. They were heard in the Superior Court, without a jury. The finding of the court was that Richmond's new building stands partly on land over which teams were accustomed to pass in the rear of the Slater Block, and that by the new building Richmond had both narrowed the way and widened it, as above stated. The court refused to order the removal of the building, determined the location and width of a passageway to be thereafter maintained, ordered the removal of the fence and post, and that the damages of Starkie and of Green should be assessed in their respective cases by a jury. These are the damages which, by the agreement recited in the present bill of exceptions, were in fact assessed in the respective cases in accordance with the decrees therein, and which it is now further agreed amounted altogether to the sum of $2,587.86. It is now further agreed that, as between Green and Richmond and as between Starkie and Richmond, these damages were reasonable, and that $677.46 were reasonable counsel fees, and that $51 were reasonable witness fees incurred by Richmond in defending those suits, and that $232.54 was the diminution in value of Richmond's estate by reason of the encumbrance on the triangular piece of his land at the southeast corner, and that the Green and Starkie damages, the witness fees, and the diminution in value were fixed by the proceedings in those suits under the final decrees.

The four sums just mentioned are the same found by the presiding justice at the trial of the present case reported in 164 Mass. in the finding, "that in order to remove so much of the

encumbrance as is affected by the cases of Starkie and Green against Richmond, the plaintiff had to pay in damages $2,587.86 ; for reasonable counsel fees, $677.46, and for witness fees, $51 ; making a total of $3,316.32 " ; and in the finding, " That by reason of said encumbrance upon a triangular piece of the plaintiff's land at the southeast corner, the plaintiff's estate was diminished in value, in 1892, to the extent of $232.54."

At the new trial on the question of damages, the defendant claimed to go to the jury on two questions of fact. First, of notice to Mrs. Ames of the suits of Green and Richmond, and of *Starkie* v. *Richmond*, and, secondly, on the question of the good faith of Richmond toward Mrs. Ames in building on the encumbered strips of land after the notice, contained in the conversation before recited between Richmond and Mrs. Starkie, of Starkie's claim as to the passageway and its width.

With regard to the question of notice to Mrs. Ames, both she and Richmond gave substantially the same testimony which is reported in *Richmond* v. *Ames*, 164 Mass. 467, 470, 471, and each of them gave some additional testimony of a character substantially similar to that so reported. We find nothing in the whole evidence at the last trial to make the question whether notice could properly be found from it a different one from that decided adversely to Richmond in *Richmond* v. *Ames*, 164 Mass. 467, 475, and therefore need not discuss it further.

On the question of the good faith of Richmond toward Mrs. Ames in building on the encumbered strips of land after he had notice of Mrs. Starkie's claim in regard to the passageway, Mrs. Starkie, who was the wife of the plaintiff in *Starkie* v. *Richmond*, and who, as stated, was acting for him at the time, was called as a witness, but her testimony was only as to her interview with Richmond, and was entirely in accord with the account of that interview given in the reported cases specified.

There was no new evidence tending to establish any other facts touching the boundary lines, or the building of his block by Richmond, than those which have appeared in the reports referred to.

The plaintiff, among other requests which need not now be discussed, asked the court to rule, in substance, that the evidence relied on by the defendant to prove that the plaintiff proceeded

in bad faith in building his block and in building his corner fence is incompetent and insufficient to sustain a finding to that effect by the jury. The presiding justice refused to give this instruction, and left it to the jury to say whether the plaintiff proceeded in good faith in erecting his building after the notice from Mrs. Starkie. The verdict was for the plaintiff, in the sum of $1,133.98.

The only additional features bearing upon the question thus left to the jury, against the plaintiff's exception, beyond that presented by the reported cases of *Starkie* v. *Richmond*, *Green* v. *Richmond*, and *Richmond* v. *Ames*, before mentioned, and which were considered by this court in the decision in *Richmond* v. *Ames*, were the testimony of Mrs. Starkie above referred to, and the agreement that the four sums were reasonable sums, and that all of them except the counsel fees were fixed in the former suits. It was said in that decision that it was " entirely consistent with the facts reported, that the present plaintiff proceeded in good faith in erecting his building, even after the notice of Starkie's wife. The facts so far as they are reported are such that it might well require the judgment of a court in order to determine the boundaries and width of the passageway which Starkie and Green were entitled to use." If after that decision it was open to the defendant to try the question whether Richmond proceeded in good faith to erect his building after the notice from Starkie's wife, we find nothing in the slight additional evidence, or in the agreements now before us, to justify a finding that he proceeded in bad faith. That he erected the building and contested the suits with a design to make expense for Mrs. Ames is inconceivable. While he was putting up a block within the right plainly given by his own deed, a woman came to him in the alleyway and told him that he was encroaching on the alleyway, and that the deeds of her husband came first. His position as announced in his reply was that he was going by his own deed. He kept on at the work, which was then either in the stage of the removal of the old building, or had progressed only so far as to show where the wall of the new building was to be. There was no further or other notice or remonstrance or complaint for nine years. So far from acting oppressively toward Mrs. Ames, he had, shortly after obtaining his deed from her, without resorting

to her, compelled Davis, her grantor, to make good the damage done him by reason of the fact that he was precluded from building over the way. In relying upon his own deeds, he was within his legal right, as he was also in defending the suits. He certainly made no concealment of the fact that the suits were being pressed against him, and talked about them with Mr. Ames, who was the agent of Mrs. Ames in managing her real estate, and had him as a witness in the suits. We find no circumstance indicating any improper or unreasonable motive or act on the part of Richmond throughout the transaction from beginning to end. He acted within the right given him by the defendant's deed, was cast in damages at the end of a long delayed, tedious, and doubtful litigation, and was, we think, entitled to have the jury instructed that the evidence relied upon to prove that he proceeded in bad faith was insufficient to sustain a finding to that effect.                    *Exceptions sustained*.